**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| **TANIA DAVIS**, |
| *Plaintiff,* |
| v. |
| **HENRY COMPANY, et al.**, |
| *Defendants.* |

**Case No. 2:25-cv-00025-JDW**

## <u>MEMORANDUM</u>

Antidiscrimination laws do what their name suggests: they bar discrimination. In the workplace setting, they do not prevent an employer from terminating an employee who the employer decides is not good at her job. Of course, sometimes an employer will try to cover up the real reason that it fires an employee because it knows that discrimination is illegal. Tania Davis claims that Henry Company and Carlisle Companies (collectively, "Henry") did just that. But it's not enough for her to say it; she has to offer enough evidence for a jury reasonably to conclude that Henry is trying to cover up its discrimination. In that effort, she comes up short. The evidence in this case shows that Ms. Davis was a subpar employee in the 59 days that she worked at Henry and that Henry fired her during her probationary period rather than continue to try to train her. Maybe that was harsh, maybe it was smart business. But I conclude that no reasonable jury could conclude that it was discriminatory, so I will grant Henry's summary judgment motion.

## I.    BACKGROUND

### A.    Ms. Davis's Employment At Henry

On June 14, 2022, Ms. Davis accepted an offer to work as a Customer Service Representative at Defendants Henry Company and Carlisle Companies, Inc. (collectively, "Henry"). The terms and conditions of the offer provided, among other things, that Ms. Davis would report to Customer Service Manager Tracy Dero and that Ms. Davis's position would be at will. Ms. Davis began work on June 20, 2022. As a customer service representative, Ms. Davis was responsible for facilitating a positive customer experience and processing customer purchase orders. To bring her up to speed, Ms. Davis received a series of training materials and basic orders to process. Henry permitted her to shadow other customer service employees to learn the ins-and-outs of the job. Like all new customer service employees, Henry put Ms. Davis on a 90-day probationary period to ensure she could handle the responsibilities of her role. Henry terminated Ms. Davis on August 18, 2022.

### 1.    Performance issues

During Ms. Davis's time at Henry, Ms. Dero saw or heard about several performance problems on Ms. Davis's part. On July 13, 2022, Senior Customer Service Coordinator Brad Copeland reported to Ms. Dero that Ms. Davis had not entered two orders that he left for her two days earlier. He also noted that Ms. Davis was "late everyday" and "never gets up to ask for something to do." (ECF No. 21-2 at 25.) Mr. Copeland opined that Ms. Davis

"doesn't have basic computer knowledge," "is learning [Henry's] system even slower [than] normal," and "doesn't have the can-do attitude that someone should have when they are new." (ECF No. 21-2 at 25.)

On July 22, 2022, a customer emailed Henry's customer service team and requested that someone review an incorrect purchase order. Ms. Davis, who had entered the incorrect information on the purchase order, wrote to the customer that she was "working remotely," "d[id] not have access to the PO," and asked the customer to provide "the correct PO# ... so that I can fix it quickly instead of waiting until Monday[.]" (ECF No. 28-17 at 2; *see also* ECF No. 21-2 at 26.) After the customer provided the purchase order information, Ms. Davis did not correct the error but instead told the customer that the purchase order "look[ed] to be entered one time" and to "[l]et me know if you have any further ?'s." (ECF No. 28-17 at 2.)

Ms. Dero contacted Ms. Davis to say that she "d[id] not believe [Ms. Davis] [was] addressing the customer's issue." (ECF No. 28-17 at 1.) Ms. Dero also told Ms. Davis to pull the purchase order so that they could review it on Monday. The next day, Ms. Dero followed up with Ms. Davis via email to explain what Ms. Davis had done wrong, how to fix it, and how to inform the customer that the error was corrected. Ms. Dero also directed Ms. Davis to "spell out all words" in communications with customers so that the customer service team does not appear to be "texting" with them. (ECF No. 21-2 at 26.)

Others complained about Ms. Davis's speed in performing her duties. In the last week of July 2022, a coworker tasked with monitoring new employees emailed Ms. Davis to ask if she had "been able to get any orders entered yet today" because she had "not see[n] any in the system for [Ms. Davis] yet." (ECF No. 21-2 at 27.) On another occasion, this coworker checked in with Ms. Davis after noticing Ms. Davis had only completed one order, to which Ms. Davis responded that she was not about speed but about accuracy. (ECF No. 21-2 at 27–28.)

Ms. Davis's speed eventually caused Ms. Dero to have to do her job for her. On August 8, 2022, seven members of the customer service team were provided with instructions and asked to complete a total of 26 tasks, four of which were assigned to Ms. Davis. By the following evening, five of the team members had completed their assigned tasks. Ms. Davis was not one of them. Upon noticing that Ms. Davis had not completed any of her assigned tasks, Ms. Dero took over and did them for her. Ms. Dero then emailed Ms. Davis, saying "[y]ou didn't[] have any done so I took care of them. Do not duplicate." (ECF No. 21-2 at 29.)

Even with Ms. Dero stepping in, Ms. Davis still did not speed up. On August 10, 2022, Pricing Specialist Nancy Willard sent a "high" priority email to the customer service team requesting that a customer's orders be released. (ECF No. 21-2 at 29.) The task was not completed that day. Then, the following day, Ms. Dero reached out to Ms. Davis and reminded her to ask for help if she was "not sure what to do on these" and to leave

customer service requests unread in the email box if she had not completed it. (ECF No. 21-2 at 30.) Ms. Davis still had not completed Ms. Willard's request by the morning of August 11, 2022, causing Ms. Willard to send a follow-up email to again ask for the release of the customer's orders.

### 2.      Health-related concerns and absences

Ms. Davis suffers from acute Diverticulitis Menstrual Dysmenorrhea, which is a medical condition that causes severe pelvic and abdominal pain and extreme cramping during menstruation. Sometime in July 2022, Ms. Davis informed Lisa Maestas, an employee in HR, about her medical condition. Ms. Maestas told Ms. Davis that she would let Ms. Davis's supervisors know about her condition. However, Ms. Maestas did not send Ms. Davis confirmation that she had done so.

On July 25, 2022, Ms. Davis left work without first notifying Ms. Dero. Later that day, Ms. Davis texted Ms. Dero, explaining that she "will ... inform HR of a preexisting issue that [she] ha[s] that sets [her] menstrual off from time to time." (ECF No. 21-2 at 26–27.) Mr. Dero responded by acknowledging that she was aware of Ms. Davis's condition but "didn't know it was to the point of leaving" and saying that she understands "things come up" but that she needs Ms. Davis to "[p]lease make sure I'm aware you are going home etc in [the] future" as "I need reliability" given the nature of customer service's role. (ECF No. 21-2 at 27.)

On August 10, 2022, Ms. Davis followed up with Ms. Maestas about her disclosure of her medical issues. Ms. Maestas confirmed that she had notified Ms. Dero and that Ms. Dero was informed that Ms. Davis had abruptly left work on July 25, 2022, because of her "cramps." (ECF No. 21-2 at 59–60.) On August 18, 2022, Ms. Davis told Ms. Dero that she had been experiencing an "episode" and would be working from home after eating something and taking medication. (ECF No. 21-2 at 40.) Ms. Dero wrote back, telling Ms. Davis that she needed Ms. Davis in the office even if Ms. Davis had to come in after her normal start time. Ms. Davis made her way to the office that morning.

### 3. Complaints of discrimination

In Ms. Davis's time at Henry, she was the only black employee on the customer service team. During that time, two Henry employees made remarks that she deems to have been about her about her race. Ms. Davis contacted HR about these interactions.[1] On July 28, 2022, Ms. Davis emailed Ms. Maestas to request a meeting to talk "about something important … not about our last convo about being sick." (ECF No. 21-2 at 55.) Ms. Davis followed up the next day thanking Ms. Maestas and letting her know that she "read some articles on how to approach these kinds of situations in a professional way."

---

[1] Henry disputes that Ms. Davis ever reported experiencing racial discrimination in the workplace because there is not an explicit reference to race or discrimination more generally in any of Ms. Davis's messages with Ms. Maestas. However, given that I am to draw all reasonable inferences in Ms. Davis's favor at this stage in the litigation and that the record shows Ms. Davis contacted the human resources department on multiple occasions about something other than her medical issue, I conclude for purposes of summary judgment that she reported these incidents to Henry.

(ECF No. 21-2 at 55.) Ms. Maestas then told her to reach out "if the situations get[] wors[e]." (ECF No. 21-2 at 55.) Ms. Davis also emailed Ms. Maestas on August 12, 2022, asking if she had "some time this evening to go over some confidential information/updates I would like to send you." (ECF No. 21-2 at 55.)

### 4.     Termination

On August 11, 2022, Ms. Dero had a phone call with Ms. Davis during which Ms. Dero expressed her frustrations with Ms. Davis's performance. Following the call, Ms. Davis emailed Ms. Dero and acknowledged that she knew Ms. Dero was "extremely frustrated" with her performance but tried to explain that she was "still new and learning." (ECF No. 21-2 at 31.) Ms. Dero responded that she was "struggling to understand" why Ms. Davis was "not further advanced," given that Ms. Dero "had spelled it out in emails and know the other [customer service representatives] have been going over things with [Ms. Davis]." (ECF No. 21-2 at 32.) Ms. Dero also advised Ms. Davis that "[r]ather [than] pushing back[,] it would be more beneficial to look at the reference guides you have, videos available[,] and [customer service representative's] assistance." (ECF No. 21-2 at 32.)

On August 12, 2022, Ms. Dero decided to fire Ms. Davis. Ms. Dero worked with Michael Seal, Henry's Vice President of Human Resources, and others to finalize a termination plan. One reason that Ms. Dero cited in justifying Ms. Davis's firing was that she had only entered 29 orders. (ECF No. 21-2 at 64.) That number, however, was wrong; Ms. Davis had entered 76 orders. Mr. Seal also sought advice from Henry's attorney,

Miguel Hernandez, which was not Henry Company's typical practice for terminating employees. After the conclusion of this process, Ms. Dero terminated Ms. Davis on August, 18, 2022, once Ms. Davis came to the office.

### B.    Procedural History

Ms. Davis filed her employment discrimination Complaint against Henry on January 3, 2025, and amended it on August 12, 2025. In the Amended Complaint, Ms. Davis asserts claims for racial discrimination, hostile work environment, disability discrimination, failure to accommodate, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans with Disabilities Act, and the Pennsylvania Human Relations Act. Following discovery, Henry moved for summary judgment on all of Ms. Davis's claims. Ms. Davis opposed but stated that she is "no longer pursu[ing] her underlying hostile work environment or race discrimination claims" and requested that I deem Henry's summary judgment motion moot as to those claims. (*See* ECF No. 22 at 1 n.1.)[2]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[2] Henry's original deadline to file a reply was December 26, 2025. Henry requested, Ms. Davis consented to, and I granted an extension of that deadline to January 8, 2026. But Henry did not file a reply by the deadline. Instead, over a week later, on January 16, 2026, Henry submitted a letter asking permission file a reply *nunc pro tunc*. Ms. Davis filed a motion to strike the letter for failure to comply with my Policies and Procedures. Because I am granting summary judgment in Henry's favor on all of Ms. Davis's claims, I will deny Ms. Davis's motion to strike as moot.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alternation and quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, [s]he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). If she fails to make this showing, then the court may "consider the fact undisputed" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2)-(3).

## III.   ANALYSIS

### A.   Discrimination And Retaliation

Courts reviewing employment discrimination and retaliation claims apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667–68 (3d Cir. 1999) (ADA discrimination claims); *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (retaliation claims); *Higgins v. MetLife Inc.*, 687 F. Supp. 3d 644, 649 (E.D. Pa. 2023) (PHRA claims). Under that framework a plaintiff bears the burden of showing a *prima facie* case of discrimination or retaliation. *See McDonnell Douglas Corp.*, 411 U.S. at 802. The burden of doing so at this step "is not intended to be onerous." *Sempier v.*

*Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). Once a *prima facie* showing has been made, the burden shifts to the defendant to articulate some "legitimate nondiscriminatory reason" for the employee's firing. *Id.* If the defendant does so, then the burden shifts back onto the plaintiff to show by a preponderance of the evidence that the reasons offered by the defendant are merely pretext for discrimination or retaliation. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 1. *Prima facie* case

#### a. Disability discrimination

To establish a *prima facie* claim for disability discrimination, a plaintiff must establish that she (i) is disabled within the meaning of the ADA; (ii) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (iii) has suffered an adverse employment action because of the employer's discrimination. *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). For the second element, the plaintiff bears the burden of proving she is "an otherwise qualified" individual. *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). An otherwise qualified individual will have the prerequisites for the position (*e.g.*, the educational background, employment experience, licenses, etc.) and the ability to perform the essential functions of the position with or without reasonable accommodation. *See Gaul*, 134 F.3d at 580.

Henry does not dispute that Ms. Davis had the prerequisites for her role, but it argues that she lacked the ability to perform the essential functions of her position with or without reasonable accommodation because she failed "to communicate clearly in writing and verbally" with customers. (ECF No. 21-1 at 23.) But Henry's argument misconstrues the inquiry. The relevant question is a matter of kind, not degree. *See McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 415 (3d Cir. 2017). That is, when determining whether Ms. Davis is a qualified individual for purposes of establishing her *prima facie* disability discrimination case, I must determine whether she had the *ability* to perform the required tasks of her role, not whether she could perform them to the *degree* her boss found to be satisfactory. Henry takes issue with the way that Ms. Davis communicated, but it does not dispute that she had the ability to interact with customers. Given that this inquiry is limited to whether Ms. Davis could perform the requisite tasks of her role and does not encompass the degree at which she performed them, Ms. Davis has met her burden of establishing a *prima facie* case of disability discrimination.

### b.    Retaliation

To establish a *prima facie* case of retaliation under the ADA, Section 1981, Title VII, and the PHRA, a plaintiff must show (i) she engaged in protected employee activity, (ii) the employer took adverse action after or contemporaneous to the time at which she engaged in protected activity, and (iii) there is a causal link between the protected activity and adverse action. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)

(retaliation under ADA); *see also Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 101 (E.D. Pa. 2023) (retaliation under Section 1981, Title VII, and the PHRA). Courts consider the totality of circumstances when determining whether a plaintiff has established the requisite causal connection. *See Farrell v. Planters Livesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000). However, "an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish" that there is a causal link. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (quotations omitted).

In this case, there is temporal proximity between the protected activity and adverse employment action. Ms. Davis first informed Henry about her acute diverticulitis menstrual dysmenorrhea sometime in July. Henry decided to terminate her on August 12, 2022, approximately two weeks later. Perhaps more importantly, Henry does not appear to dispute that Ms. Davis has established a *prima facie* case of retaliation. Thus, considering the close temporal proximity between protected activity and her termination, Ms. Davis has established a *prima facie* case of retaliation.

### 2.    Legitimate nondiscriminatory/nonretaliatory reason

Henry has provided a legitimate nondiscriminatory and nonretaliatory reason for firing Ms. Davis: she failed to satisfactorily perform the requisite tasks of her job. As the burden is one of articulation, not proof, Henry has satisfied its burden. *See McDonnell Douglas Corp.*, 411 U.S. at 802.

### 3.    Pretext

Because Henry articulated a legitimate, non-discriminatory reason for terminating Ms. Davis, the burden shifts back onto Ms. Davis to show that Henry's explanation was pretextual. To establish pretext, Ms. Davis "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Henry's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Henry's] action." *Qin v. Vertex, Inc.*, 100 F.4th 458, 474–75 (3d Cir. 2024) (quotation omitted). She can meet this burden by "painting the employer's articulated reasons as weak, implausible, contradictory, or incoherent" or "by showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, or that the employer treated other, similarly situated persons not of [her] protected class more favorably." *Canada*, 49 F.4th at 347 (alternations accepted and quotations omitted).

Ms. Davis does none of this. In her opposition brief, she points to seven different parts of the record to argue that a jury could reasonably determine that Henry is lying when it said Ms. Davis's job performance led to her termination. But this evidence, whether considered individually or collectively, is insufficient for a jury to reasonably draw such a conclusion. At times, the record contradicts it.

*First*, Ms. Davis contends that Henry did nothing to investigate her claims of racial discrimination, leaving Ms. Davis to look up how to handle such situations on her own. Even if true, that argument seems directed at Ms. Davis's now-abandoned racial

discrimination claim. A failure to investigate racial discrimination does not suggest pretext as it relates to disability discrimination or retaliation. In addition, the argument flies in the face of the numerous decisions from courts in this circuit that have held a failure to investigate claims of discrimination is not enough to show pretext. *See, e.g.*, *Geddis v. Univ. of Del.*, 40 F. App'x 650, 653 (3d Cir. 2002); *Glenn v. Raymour & Flanigan*, 832 F. Supp. 2d 539, 553 (E.D. Pa. Dec. 22, 2011); *Epps v. First Energy Nuclear Operating Co.*, Civ. Action No. 11-1462, 2013 WL 1216858, at *29 (W.D. Pa. Mar. 25, 2013). I agree with these decisions. Ample evidence shows that Ms. Davis's job performance was subpar. The fact that Henry did not investigate her complaints about direct remarks she received from two employees and indirect remarks she heard around the office is not enough to cause a jury to reasonably disbelieve that Henry fired her for lackluster performance or believe that disability discrimination or retaliation caused her termination.[3]

Ms. Davis argues that Henry's failure to investigate suggests that the company intended to retaliate against her for making those same complaints. However, Ms. Davis does nothing to connect the lack of investigation to a retaliatory motive other than this

---

[3] Ms. Davis only cites two cases from this Circuit to support her argument, neither of which is persuasive. ((*See* ECF No. 22 at 12) (citing *Stankiewicz v. Pump N' Pantry, Inc.*, Civ. Action No. 3:20-cv-2021, 2022 WL 36238 (M.D. Pa. Jan. 4, 2022) and *Ellingsworth v. Hartford Fire Ins. Co.*, 247 F. Supp. 3d 546 (E.D. Pa. 2017)).) The cases have a different procedural posture and do not relate to pretext. Ms. Davis never reconciles the fact that these cases were decided at the motion to dismiss stage as opposed to the summary judgment stage. Nor does she acknowledge that they concerned whether a plaintiff could establish a *prima facie* case instead of pretext. Given these differences in combination with the record, I am not persuaded by Ms. Davis's arguments that a failure to investigate establishes pretext.

attorney argument. There's a difference, however, between turning a deaf ear to complaints of discrimination and deciding to retaliate against someone for making those complaints. One doesn't necessarily suggest the other, and Ms. Davis offers no evidence to support her assertion that one suggested the other in this case.

Ms. Davis also argues Henry harbored animosity towards her disability and need for accommodations because Ms. Maestas failed to inform Ms. Dero of Ms. Davis's medical condition and because Ms. Dero expressed no "concern for Ms. Davis or her health whatsoever" on the day that Ms. Davis abruptly left work due to her cramps. (ECF No. 22 at 13, 15 (emphasis omitted).) However, even drawing all inferences in Ms. Davis's favor, the record does not support Ms. Davis's contentions. For one thing, on August 10, 2022, Ms. Maestas confirmed with Ms. Davis that Ms. Maestas informed Ms. Dero of Ms. Davis's medical condition. And, even if Ms. Maestas took some time to inform Ms. Dero of Ms. Davis's medical condition, no reasonable factfinder would conclude that Henry harbored animus towards Ms. Davis's disability because of a delay that, at most, totaled a couple weeks.

I also disagree with Ms. Davis's characterization that Ms. Dero did not express any concern for her disability. Ms. Dero acknowledged that she was aware of Ms. Davis's symptoms but "didn't know it was to the point of leaving," said that she "understand[s] things come up," and explained she just needs to be "aware you are going home etc in [the] future." (ECF No. 22 at 13.) Just because Ms. Dero emphasized the need for reliability

does not mean she was not concerned for Ms. Davis. In any event, the fact that a coworker or supervisor did not express much sympathy is not enough for a jury to reasonably conclude there was discriminatory animus. The law doesn't demand sympathy.

*Second*, Ms. Davis contends that she "had not been notified of anyone, including management or customers, complaining about any aspect of her performance." (ECF No. 22 at 15–16 (emphasis omitted).) The record makes clear that that's not true, though. Ms. Dero sent many emails to Ms. Davis about her poor performance. In any event, Ms. Davis's subjective understanding of how she was performing at work does not shed light on how Henry perceived her performance, and the record establishes that at the time that Ms. Davis worked at Henry, many people who worked with her were unhappy with her performance. Ms. Dero received messages from other employees about Ms. Davis showing up late, not completing assignments, and not volunteering to help the customer service team. It's possible that Henry could have done a better job communicating with her, but that's not the relevant inquiry. The record confirms that Henry's employees – including her supervisor with the power to terminate her – thought Ms. Davis was doing a bad job, and Ms. Henry has not pointed to anything to suggest that the company used those concerns as a pretext to terminate her.

*Third*, Ms. Davis argues that the fact that Ms. Dero understated the amount of work Ms. Davis had completed when justifying Ms. Davis's termination, coupled with the fact that Henry sought advice from a lawyer prior to firing Ms. Davis, could lead a jury to

believe that Henry was trying to conceal its "nefarious intent and/or prepare for litigation, knowing [it] w[as] acting in discriminatory and retaliatory fashion." (ECF No. 22 at 22.) But Ms. Davis provides no evidence that suggests Ms. Dero intentionally lied when she said Ms. Davis had completed less work than she did. While I must draw inferences in Ms. Davis's favor in ruling on a summary judgment motion, finding nefarious intent from an ostensible mistake is more than an inference; it's a logical leap. Mistakes happen, and Ms. Davis needs some evidence to suggest that the mistake wasn't innocent before the inference she suggests would become reasonable.

In addition, a company's decision to use a different method for terminating an employee and to consult a lawyer before doing so does not show that the employer's articulated reason for terminating the employee was pretextual. Ms. Davis provides no explanation for how Henry's departure from past practice discredits its articulated reason that she failed to sufficiently perform the requisite duties of her role. She merely points out the incorrect statement and protocol departure and leaves it for me to assume the rest. Again, that's more than an inference, and it's not enough on this record for a jury to find pretext.

*Fourth*, Ms. Davis argues that the temporal proximity between the time she engaged in protected conduct and the time she was fired establishes pretext. Temporal proximity can call into question an employer's motive in terminating an employee. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 709 (3d Cir. 1989). But that does not mean it does so in

this case. Ms. Davis only worked at Henry for 59 days. Thus, everything happened in a short period of time. And, while Ms. Davis engaged in protected activity during that time, she also performed poorly. Under those circumstances, even drawing inferences in her favor, the timing of the termination decision does not suggest that retaliation was really at play or otherwise call into question Henry's explanation for its decision.

*Fifth*, Ms. Davis attempts to show contradictions in Henry's reason for firing her by highlighting alleged inconsistencies between parts of Ms. Dero's statements with other parts of the record, but the argument misconstrues the record and goes beyond reasonable inferences. In addition to Ms. Dero's error about the number of tasks that Ms. Davis completed, Ms. Davis takes issue with Ms. Dero's testimony that no one knew where Ms. Davis went on the day she left work and that she did not know about Ms. Davis's health conditions until August 11, 2022. She bases her argument on Ms. Maestas's message on August 10, 2022. But that message came weeks after Ms. Davis left work on July 25, 2022, and it doesn't shed any light on what Ms. Dero knew on the day that Ms. Davis left, as opposed to information that Ms. Dero learned some time later.

*Sixth*, Ms. Davis points to Jennifer Pinzon as a comparator whose work "often had to be corrected" but who Henry did not terminate. (ECF No. 22 at 24 (emphasis omitted).) But aside from the fact that they both made mistakes, Ms. Davis does not explain how closely related she and Ms. Pinzon were. For instance, Ms. Davis does not indicate whether Ms. Pinzon made the same number or type of mistakes or made them with the same

18

frequency. Nor does Ms. Davis reconcile the fact that Ms. Pinzon, who had worked at Henry for three years, was not in the initial 90-day probationary period of her employment, meaning they were not similarly situated.

*Seventh*, and finally, Ms. Davis argues that Henry replaced her with a non-disabled Caucasian person. While courts have found a plaintiff to have established a *prima facie* case for discrimination when the plaintiff shows the company replaced her with someone outside of her protected class, *see, e.g.*, *Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 241–42 (3d Cir. 2007), Ms. Davis fails to explain how this casts doubt on Henry's articulated reason for firing her. Ms. Davis has cited no case that stands for a *per se* rule holding that a plaintiff establishes pretext if she shows that she was replaced by a person outside of her protected class. Indeed, the only cases Ms. Davis cites in support of this argument are cases holding that a plaintiff can establish a *prima facie* case for discrimination by showing she was treated differently than employees who were outside of her protected class.[4] But the cases say nothing about whether such evidence is enough to establish pretext. In fact, in the *Johnson* case that Ms. Davis cites, the Third Circuit held the plaintiff failed to establish pretext despite having made out a *prima facie* case for discrimination by showing he had been replaced by someone outside of his protected class. *See Johnson*, 214 F. App'x at 242–43.

---

[4] *See Johnson*, 214 F. App'x at 241–42; *see also Paige v. Crozer Chester Med. Ctr.*, Civ. Action No. 08-4149, 2009 WL 533068, at *5 (E.D. Pa. Mar. 3, 2009).

19

Finally, the evidence collectively on which Ms. Davis relies does not amount to more than the sum of its parts. That is, the various items to which she points, whether considered individually or holistically, do not establish a basis for a factfinder to "reasonably either (1) disbelieve [Henry Company's] articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Henry Company's] action." *Qin*, 100 F.4th at 474–75 (quotation omitted). Each piece of evidence that she cites suffers substantial flaws, and they do not collectively wash those flaws away.

**B.      Failure To Accommodate**

To establish a failure-to-accommodate claim under the ADA, a plaintiff must establish (1) she was disabled and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017). But even if an employee makes a request, employers are under no obligation "to make on-the-spot accommodations of the employee's choosing." *Phillip v. GEO Secure Servs., LLC*, Case No. 2:22-cv-00565, 2024 WL 2383923, at *6 (E.D. Pa. May 23, 2024) (quotation omitted). Moreover, while it appears the Third Circuit has yet to address the issue, other courts have held that an employer has no obligation to provide a reasonable accommodation if an employee fails to request an accommodation before the employer has made the decision to fire her. *See McCarroll v. Somerby of*

*Mobile, LLC*, 595 F. App'x 897, 899 (11th Cir. 2014); *Gonzalez v. Faithful+Gould, Inc.*, Case No. 1:17-cv-00624, 2017 WL 6559905, at *5 (E.D. Va. Dec. 22, 2017); *see also Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012). These decisions make sense because the employer does not have to reverse its termination decision after an employee makes a request for an accommodation. And the duty to accommodate is forward-looking, meaning that if an employee engaged in deficient conduct without requesting an accommodation, the employer can fire her for that conduct. *See Halpern*, 669 F.3d at 465.

The Parties do not dispute that Ms. Davis is disabled or that Henry knew about her disability. The Parties also agree that Ms. Davis was not punished after she left work without telling her supervisor on July 25, 2022. Rather, Ms. Davis's failure to accommodate claim appears to arise from Henry's denial of her request to work remotely on August 18, 2022 – the day it terminated her. Because it is undisputed that Ms. Dero made the decision to fire Ms. Davis before Ms. Davis requested to work from home, Henry was under no obligation to provide Ms. Davis with an accommodation. And even if Henry had to provide an accommodation, it was not legally required to give Ms. Davis the accommodation she sought right on the spot. Ms. Davis has thus failed to show that there is a genuine dispute as to any material fact related to her failure-to-accommodate claim.

## IV.    CONCLUSION

Ms. Davis has abandoned her racial discrimination and hostile work environment claims. As for the remaining claims, a jury could not reasonably conclude that Henry discriminated against Ms. Davis based on her disability or retaliated against her for notifying Henry about her disability or for complaining about racial discrimination. Ms. Davis also failed to show that Henry did not provide her with an accommodation to which she was entitled. Therefore, Henry is entitled to summary judgment on all Ms. Davis's claims. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

April 23, 2026